George **ROSENBLOOM**

v.

**METROMEDIA, INC.**

No. 36542.

United States District Court
E. D. Pennsylvania.

Aug. 28, 1968.

Paul, Greenberg & Sanders, by Benjamin Paul, Philadelphia, Pa., for plaintiff.

Fox, Rothschild, O'Brien & Frankel, by Israel Packel, Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, District Judge.

This is an action for libel. The plaintiff, a citizen of Pennsylvania, was at the time of the events which gave rise to the present action a distributor of nudist magazines in a territory including Philadelphia and the surrounding area. The defendant, Metromedia, Inc., a Delaware corporation with its principal place of business in New York, owns and operates a radio station in Philadelphia known as WIP.

The jury rendered a verdict in favor of the plaintiff of general damages in the sum of $25,000 and punitive damages in the sum of $725,000. The defendant has filed motions for judgment notwithstanding the verdict, or, in the alternative, for a new trial.

The asserted liability of the defendant was based upon two series of broadcasts in the fall of 1963. The first series, October 4 and 5, dealt with raids on the plaintiff's home and warehouse and his arrest by the Special Investigations Squad of Philadelphia Police Captain Clarence Ferguson. The first broadcast was that of October 4, 1963 at 6:00 p. m.:

"City Cracks Down on Smut Merchants

"The Special Investigations Squad raided the home of George Rosenbloom in the 1800 block of Vesta Street this afternoon. Police confiscated 1000 allegedly obscene books at Rosenbloom's home and arrested him on charges of possession of obscene literature. The Special Investigations Squad also raided a barn in the 2000 block of Welsh Road near Bustleton Avenue and confiscated 3000 obscene books. Captain Ferguson says he believes they have hit the supply of a main distributor of obscene material in Philadelphia."

The substance of this broadcast was repeated seven more times. The only difference of any significance was that in the last six the script added the word "reportedly" or "allegedly" in referring to the books seized in the barn.

The second series, October 21, 25 and November 1, involved the plaintiff's action for an injunction against the allegedly illegal arrests and the publicity thereof. The broadcast of October 21, 1963, at 8:30 a. m. is representative:

"Federal District Judge Joseph S. Lord, III,[1] will hear argument today from two publishers and a distributor, all seeking an injunction against Philadelphia Police Commissioner Howard Leary, District Attorney James C. Crumlish, Jr., a local television station and a newspaper, ordering them to lay off the smut literature racket.

"The girly-book peddlers say the police crackdown and continued reference to their borderline literature as smut or filth is hurting their business. Judge Lord refused to issue a temporary injunction when he was first approached. Today he'll decide the issue. It will set a precedent and if the injunction is not granted it could signal an even more intense effort to rid the city of pornography."

At 9:30 a. m. on the same day, defendant's broadcast was:

"Smut distributors seek an injunction against police raids in Philadelphia."

All of the broadcasts in this series were replete with repeated references to "smut" and "girlie books". Furthermore, the plain implication of the broadcasts was that the plaintiffs in the federal court were attempting to halt the general campaign against pornographic literature. The unmistakable inference was that plaintiffs wanted to stop all raids throughout the city, even as against literature that was, in fact, pornographic and even though they had nothing to do with its distribution. Thus, at 2:00 p. m.

on October 21, defendant described the plaintiffs as:

"* * * asking an injunction against further raids by police and the District Attorney's office on smut publications. The complainants charge they are being hurt financially. * * *"

Again (October 21 at 4:30 p. m.), the broadcast had complainants going before "Judge Gold"[2]:

"* * * claiming they are suffering economic and financial hardship because of a recent crackdown on smut material."

The suit (Outdoor American Corp. et al. v. City of Philadelphia, et al., C.A. No. 34316) was, in fact, only concerned with plaintiffs' publications. It asserted that the publications were not obscene and sought to protect only their own assertedly lawful business.

There is no evidence of what investigation was conducted by defendant other than a reliance on Captain Ferguson for the first series of broadcasts. Captain Ferguson, who had never been to the Philadelphia Art Museum and who was uncertain of its location, conceived of obscenity as:

"A. Any time the private parts is [sic] showing of the female or the private parts is [sic] shown of males and they are offered for sale to the public, that is what I consider the answer, Mr. Paul."

## I.

New York Times Co. v. Sullivan, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), laid down the First Amendment rule applicable to libel actions by public officials:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—

---

1. The judge in question was in fact the Hon. John W. Lord, Jr.

2. A common Pleas Court judge not involved at all.

that is, with knowledge that it was false or with reckless disregard of whether it was false or [not]. * * * "

Curtis Publishing Co. v. Butts (Associated Press v. Walker), 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) considered the impact of *Sullivan* on suits brought by those who are not public officials, but who are "public figures". In that case, Mr. Justice Harlan enunciated a rule formulated somewhat differently from that of *Sullivan*. The Chief Justice, however, in Part I of his concurring opinion, said (388 U.S. at 164, 87 S.Ct. at 1996):

"I therefore adhere to the New York Times standard in the case of 'public figures' as well as 'public officials.' * * * "

Four other Justices concurred in Part I of the Chief Justice's opinion. It may therefore be said that the *Sullivan* standard is applicable to cases of "public figures". See Cepeda v. Cowles Magazine & Broadcasting, Inc., 392 F.2d 417, 421 (C.A.9, 1968). The question is does it apply here, a question that is by no means free of difficulty.

In *Butts*, Mr. Justice Harlan said, 388 U.S. at 134, 87 S.Ct. at 1980:

" * * * We brought these two cases here * * * to consider the impact of that decision [Sullivan] on libel actions instituted by persons who are not public officials, but who are 'public figures' and involved in issues in which the public has a justified and important interest. * * * "

It would thus appear that, having referred to the "figures" and the "issues" in the conjunctive, the Court intended the scope of *Butts* to reach only those cases where both the criteria of a public figure and a public issue were satisfied. And if this is so, we would have no difficulty in concluding that *Butts* does not govern here. George Rosenbloom was not, before defendant's onslaughts, a public figure. Unfortunately, Justice Harlan did not stop with the neat formulation of the reach of *Butts*. Footnote 19, (388 U.S. at 155, 87 S.Ct. at 1992) reads:

"Nor does anything we have said touch, in any way, libel or other tort actions not involving public figures *or* matters of public interest." (Emphasis added.)

Is this later use of the disjunctive to be taken to mean that one not a public figure may nonetheless have to bear the heavy constitutional burden if he is libelled in a matter of "public interest"? We think not.

Application of the constitutional privilege in the law of libel requires a delicate balancing of the freedoms of speech and press on the one hand, and the right of the individual to be free from injury to his reputation by defamation on the other. It cannot be gainsaid that in substituting redress in the courts for violence as a means of vindicating personal rights the law of defamation serves a very useful social function, Rosenblatt v. Baer, 383 U.S. 75, 86, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), a function no less important than that performed by the laws which provide compensatory redress for intentionally or negligently inflicted injury.

In restricting the ambit of recovery in libel actions brought by public officials and "public figures" the Supreme Court has recognized that in light of the values served by the freedoms of speech and the press, certain persons are entitled to more protection than others from injuries to reputation. Underlying the recent decisions of the Court is the notion that by their activities and their status prominent persons have assumed to some extent the risk of injury due to negligently reported falsehoods and because of their access to the media of mass communication are able to protect themselves from such injuries more adequately than others. In *Butts*, Justice Harlan adverted to " 'the hypothesis that speech can rebut speech, propaganda will answer propaganda, free debate of ideas will result in the wisest governmental policies,' Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed.2d 1137 * * *." 388 U.S. at 153, 87 S.Ct. at 1990. Noting that in personal

injury cases the courts have "given much attention to the importance of defendants' activities," the Justice said that "[t]he courts have also, especially in libel cases, investigated the plaintiff's position to determine whether he has a legitimate call upon the court for protection in light of his prior activities and means of self-defense." 388 U.S. at 154, 87 S.Ct. at 1991. In describing the two respondents in *Butts* and *Walker*, Justice Harlan said (388 U.S. at 154–55, 87 S. Ct. at 1991):

> " * * * [B]oth Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled 'public figures' under ordinary tort rules. * * * Butts may have obtained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy, but *both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements.* Whitney v. State of California, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (Brandeis, J., dissenting)." (Emphasis added.)

The Chief Justice, in his concurring opinion, described these "public figures" as individuals who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." 388 U.S. at 164, 87 S.Ct. at 1996. "And surely as a class these 'public figures' have as ready access as 'public officials' to mass media of communication, both to influence policy and to counter criticism of their views and activities." Id.

We may concede that the suppression of crime is a matter "in which the public has a justified and important interest." *Butts*, supra. However, we must also conclude that the libelee's access to means of public rebuttal of public libel is an important, if not essential factor in determining the application *vel non* of the constitutional standard. Speech cannot rebut speech nor propaganda answer propaganda where millions of listeners are available to one side, and the other side finds the telephone hung up when he attempts to protest. Such a brobdingnagian-lilliputian contest is scarcely calculated "to strike a fair balance between the interests of the community in free circulation of information and those of individuals in seeking recompense for harm done by the circulation of defamatory falsehood." Butts, supra, at 153, 87 S.Ct. at 1990.

The Supreme Court has not yet adopted First Amendment absolutes. Cf. Justice Black's concurring opinion in New York Times Co. v. Sullivan, 376 U.S. at 293, 84 S.Ct. 710. And yet, to insist upon the application of a constitutional standard under circumstances such as these would mean that a person, even though not a public figure, who is accused of crime, however negligently and however falsely, would be denied redress in the courts. We think the philosophy underlying the Supreme Court's opinion precludes such a drastic result.

▮ Rosenbloom was in no sense a public man. Indeed, he was of so little importance that when he approached the defendant seeking a hearing to prove to those in charge that his magazines were neither obscene, nor smut, nor "girlie-books", he was summarily cut off and ignored. Rosenbloom was isolated from public view until others had thrust him into it, and when the news media finished with him he was in a very real sense defenseless save to the extent that the libel law of Pennsylvania afforded him protection. We conclude, therefore, that because of his public anonymity, which precluded meaningful access to the news media as a means of protecting his reputation, even though he was tangentially involved in a public issue, plaintiff is protected by Pennsylvania libel laws without First Amendment strictures.

## II.

We turn, then, to Pennsylvania law.

The defendant argues that the court erred in its charge that the conditional or qualified privilege with which the defendant was clothed as a news medium reporting the news [3] could be abused by a showing of something less than actual malice.

In the first place, it is not at all clear that the privilege obtains in the report of a "judicial proceeding" when no "official action has been taken by the officer or body whose proceedings are thus reported." Rest., Torts, § 611, Comment C. However, assuming *arguendo* that the conditional privilege did attach, we cannot agree that only actual malice will overcome it.

"Want of reasonable care and diligence to ascertain the truth, before giving currency to an untrue communication, will destroy the privilege * * *. O'Donnell v. Philadelphia Record Co., 356 Pa. 307, 315, 51 A.2d 775, 779 (1947). See also Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., 367 F.2d 625 (C.A.3, 1966); Bausewine v. Norristown Herald, Inc., 351 Pa. 634, 645, 41 A.2d 736 (1945); Mulderig v. Wilkes-Barre Times, 215 Pa. 470, 474, 64 A. 636 (1906). And in Purcell v. Westinghouse Broadcasting Co., 411 Pa. 167, 179, 191 A.2d 662, 668 (1963), the court said:

"* * * where libel is involved, malice is not necessarily synonymous with malignance of temper, vengefulness of spirit, or personal prejudice, attributes which usually go with 'malice' in non-legal parlance. Legal malice can generate from a reckless and wanton disregard of another's rights. It may arise from a 'want of reasonable care and diligence to ascertain the truth, before giving currency to an untrue communication.' The failure to employ such 'reasonable care and diligence' can destroy a privilege which

otherwise would protect the utterer of the communication. (Montgomery v. Dennison, 363 Pa. 255, 69 A.2d 520.)"

In addition, the defendant was not prejudiced by any putative error of the court in instructing that the jury could find an abuse of the privilege based on conduct less than malicious or reckless since in awarding punitive damages the jury applied the standard now urged on the court and found, and was warranted in finding, malice or recklessness. (See discussion under V, infra.) "Although the 'actual malice' instructions were not also given in connection with the compensatory damage issue, it is difficult to conceive how petitioner could have been prejudiced by that failure in view of the fact that the jury guided by 'actual malice' instructions, awarded $3,000,000 in punitive damages." Curtis Publishing Co. v. Butts, supra, 388 U.S. at 166, 87 S.Ct. at 1997.

## III.

The defendant moves that judgment be entered in its favor because there was no showing that the defamatory broadcasts caused the plaintiff any injury; because there was no proof that any listener believed the broadcasts to be defamatory; and because there was no proof that any listener believed that the plaintiff was the subject of the second series of broadcasts.

Where a publication is libelous *per se*—that is, defamatory on its face—it is actionable *per se*; one need not prove that he received any injury as a result of the publication in order to recover damages. "In such a case, general damages for loss of personal or business reputation are recoverable and no averments or proof of special damages are necessary." Cosgrove Studio & Camera Shop, Inc. v. Pane, 408 Pa. 314, 319, 182 A.2d 751, 753 (1962). Compare, e. g. Continental Nut Co. v. Robert L. Berner Co., 393 F.2d 283 (C.A.7, 1968) (libel per quod).

3. Purcell v. Westinghouse Broadcasting Co., 411 Pa. 167, 191 A.2d 662 (1963); Rest., Torts, § 611.

■ Such words as "girly-book peddlers" and "smut peddlers" are defamatory on their face and "need no extrinsic proof of [sic] explanation." 408 Pa. at 319, 182 A.2d at 753. It is immaterial, then, that the plaintiff introduced no evidence that any listener considered the broadcasts defamatory. "The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient." Rest., Torts, § 614(2). See also Weider v. Hoffman, 238 F.Supp. 437 (M.D.Pa. 1965).

■ The defendant complains that the plaintiff offered the testimony of not a single witness that the second series of broadcasts, which did not identify the plaintiff by name, was taken to refer to the plaintiff. We left it for the jury to determine whether a reasonable listener, in view of all the circumstances, would have concluded that the broadcasts referred to plaintiff where they did not mention plaintiff by name. This was in accord with the law of Pennsylvania.

In Clark v. North American Co., 203 Pa. 346, 352, 53 A. 237 (1902), the court said:

" * * * The proper way to submit it to the jury was to call their attention to the fact that the name used in the article did not refer to the plaintiff, but to one John Clark, a different person, but, on the other hand, the description pointed directly to the plaintiff, and the jury should consider the whole article, and determine from all the evidence, whether, notwithstanding the difference of name, the description was such either intentionally or by want of due care and diligence in ascertaining the true facts, that there would be a natural and reasonable inference that the plaintiff was the person referred to. If there would, the defendant was liable. * * * "

The jury was free to find that the second series of broadcasts referred to the plaintiff from the surrounding circumstances, to wit, that the plaintiff here was the plaintiff in the federal action which the broadcasts purported to report. The news director of WIP, Mr. Rust, was a broadcaster and a listener who knew that the second series of broadcasts was, and was intended to be, about the plaintiff. The law is clear that "[t]he fact that the plaintiff is not specifically named in the [publication] is not controlling. A party defamed need not be specifically named, if pointed to by description or circumstances tending to identify him: Burkhart v. North American Co., 214 Pa. 39, 63 A. 410 (1906), * * *." Cosgrove Studio & Camera Shop, Inc. v. Pane, supra, 408 Pa. at 319, 182 A.2d at 753.

In *Burkhart*, supra, it was held that the plaintiff was sufficiently identified in an article which referred to a bassoon player in the orchestra where the plaintiff was the orchestra's only bassoon player. So here, it would appear that Rosenbloom was the only distributor of nudist magazines in Philadelphia then in the process of seeking an injunction in the federal courts against raids.

## IV.

The plaintiff was acquitted in his criminal trial springing from the arrest. The Pennsylvania court ruled as a matter of law that the magazines were not obscene. The admission into evidence of this acquittal and its use by the court are the bases of two assignments of error.

The defendant excepted to the court's charge that "Eden", the magazine purveyed by the plaintiff, was not obscene as a matter of law in the legal sense. See, e. g., Luros v. United States, 389 F.2d 200 (C.A.8, 1968). As to the defense of truth of defendant's characterization of "Eden" as "obscene," the court bifurcated the issue and instructed the jury that they must first decide whether the defendant used the word in the legal or in the lay sense. If they decided that it was used in the legal sense, the defense would fail. If used in the lay sense, the question of truth was for them to decide.

In its ruling that the magazines were not obscene in the legal sense as a matter of law, the court considered the opinion of Judge Ullman in the criminal prosecution in which the plaintiff was acquitted. We did so, however, not as a matter of applying state law under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938), but in order to determine whether the defense of truth was sufficient to go to the jury. To the extent that this essentially factual question turned on the content of the state obscenity law, the court made a legal determination. What our instruction reflected was a finding, as a matter of law, that the defendant failed to sustain its burden of proof that the magazines were obscene in the legal sense. The defendant offers no argument in its present motions that convinces us that this charge was in any way erroneous.

A related assignment by the defendant is that the plaintiff was allowed to introduce evidence of his acquittal in the criminal case and that the admission of such evidence was erroneous and prejudicial. We cannot agree.

Throughout the trial the defendant presented to the jury its defense of truth, *i. e.*, that the magazines were indeed obscene and smut and that the plaintiff was properly yclept a "smut peddler", *etc.* To this end the defendant adduced evidence that the plaintiff had been arrested on two occasions for the sale of the magazines in question and prosecuted under the state's obscenity law.

It should be noted, moreover, that calling a person a smut peddler and a distributor of obscene literature clearly imputes the commission of a crime, especially when it is reported that an arrest therefor has been made. Thus, the persistent defense of truth itself operated to blacken the character of the plaintiff in the eyes of the jury, not just making him out to be a seller of dirty books, but also one who is not above com-

mitting crimes in order to make his livelihood.[4] It is unthinkable that the jury not know that the plaintiff had been acquitted of the charges against him. Cf. Purcell v. Westinghouse Broadcasting Co., supra, 411 Pa. at 183, 191 A.2d 662.

## V.

The defendant argues that the award of punitive damages was improper because the evidence was insufficient that the defendant's conduct was malicious or reckless. The court properly charged on the law of Pennsylvania as to the standard for assessing punitive or exemplary damages:

"Secondly, if you find that this publication arose from a bad motive or malice toward the plaintiff, or if you find that it was published with reckless indifference to the truth, if you find that it was not true, you would be entitled to award punitive damages, and punitive damages are awarded as a deterrent from future conduct of the same sort.

"They really are awarded only for outrageous conduct, as I have said, with a bad motive or with reckless disregard of the interests of others, and before you would award punitive damages you must find that these broadcasts were published with a bad motive or with reckless disregard of the rights of others, or reckless indifference to the rights of others; so that your verdict should be, if you find for the plaintiff, in two parts; one, general damages and, two, punitive damages."

See Purcell v. Westinghouse Broadcasting Co., 411 Pa. 167, 187, 191 A.2d 662 (1963).

To begin with, it is clear that no one at WIP harbored any personal animus toward the plaintiff George Rosenbloom. We are convinced, however, that there was sufficient evidence of a reckless disregard both of the truth of the defama-

---

4. There is authority that such persistence in the defense of truth may be evidence of the actual malice necessary for punitive

damages. Montgomery v. Dennison, 363 Pa. 255, 267, 69 A.2d 520 (1949).

tory assertions and the rights of the plaintiff to warrant the finding of punitive damages.

As the Pennsylvania Supreme Court said in Clark v. North American Co., 203 Pa. 346, 354, 53 A. 237, 239 (1902):

> "There was evidence in the case on which the jury might have found punitive damages, and it was error to take that matter away from them. The refusal or neglect to publish a retraction as to plaintiff after he had called defendant's attention to the injustice done him was in itself sufficient, and in this connection the tone and wording of the article itself as indicative of a desire to make a sensation, * * * were open for the consideration of the jury. * * * *"

Here is what happened when plaintiff tried to call "defendant's attention to the injustice done him." Late in October of 1963, about the 26th or 27th, the plaintiff, after hearing about the broadcasts that WIP had made concerning him, visited the station's offices and asked to hear or read the broadcasts so that he might determine whether or not what he had heard was true. He spoke to representatives of the news department by means of a telephone in the reception area, and the conversation was mechanically recorded. He specifically asked to hear and was read the 12 o'clock news broadcast of October 21, 1963. What was read to him referred to smut peddlers.[5] When confronted with the article the plaintiff told the newscaster who read the broadcast to him, a man who identified himself as "Nate Wright", that the magazines in question "were found to be completely legal and legitimate by the United States Supreme Court." The plaintiff testified further as follows:

> "And the voice came back, 'Well, the District Attorney said they are obscene.'

> "I said, 'Are you sure you are quoting the District Attorney correctly because I have in my possession a public statement by the District Attorney that my magazines are completely legal, absolutely nothing obscene about them.'" (N.T. 175).

Thereupon, "Nate Wright" hung up.

There could be no more effective refusal to broadcast a retraction. Indeed, the jury may properly have thought (and we would agree) that this was even more reprehensible than a refusal to make a retraction. Plaintiff was not even accorded an opportunity to present his side of the story so that WIP could intelligently decide whether it should make a retraction. Such conduct is strong evidence of a lack of a good faith effort to ascertain the truth about the plaintiff and his business. It was a reckless disregard both of the truth of the previous broadcasts and of the rights of the plaintiff in the face of the plaintiff's representation that he was prepared to document his position that the District Attorney had stated that the magazines were not obscene.

Had WIP's representatives spoken with Mr. Rosenbloom or looked at the magazines and had still entertained an honest belief that the material was obscene or smut there might have been some basis for a finding that defendant was not reckless. But the abbreviated conversation with the plaintiff by telephone in defendant's offices, without confronting the plaintiff personally or examining the documentation he offered, was such depersonalizing conduct as to manifest a reckless disregard for a person in no position to make himself heard.

■ The conduct of WIP when approached by the plaintiff, sufficient in itself as a basis of liability for punitive damages under Clark v. North American Co., supra, was not the only evidence of a reckless disregard of the truth and of the rights of the plaintiff. The second series of broadcasts on October 21, 25 and November 1, describing a suit brought by the plaintiff to enjoin the raids and the reporting of them, contains defamatory assertions that were clearly false

---

5. The broadcast for that time in the record referred to *alleged* smut literature.

and was made at a time when the falsity of the assertions was readily ascertainable, both from an examination of the court records and of the magazines themselves. This is not then a case where a newsworthy incident occurs spontaneously and a news purveyor must rely on eyewitnesses accounts subject to the vicissitudes of human perception. Cf. Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The facts about which the broadcasts revolved were essentially static: what kind of magazines did the plaintiff sell? what was the nature of the suit he brought to protect his business?

■ Content with its ignorance of facts which would have been revealed upon the examination of material evidence, WIP relied on hearsay, and knowing its information was hearsay (or worse, conjecture), had the temerity to report that Mr. Rosenbloom and the publisher were "girly-book peddlers" and "smut distributors". These words are so highly colored that they smack of editorializing and a desire to create a sensation.[6] The broadcast of such language to describe a magazine distributor, because of its great defamatory impact, supports part of "the basic theory of libel," that "words defamatory of another, are still placed 'in the same class with the use of explosives or the keeping of dangerous animals.' Prosser, The Law of Torts, § 108, at 792." Curtis Publishing Co. v. Butts, supra, 388 U.S. at 152, 87 S.Ct. at 1990. The jury could reasonably infer that the defendant was aware of this potential danger. It could properly conclude that the defendant's failure to examine material evidence which was available and yet to make such defamatory characterizations, knowing

that such basic investigation had not been made, constituted a recklessness of conduct as to the rights of others sufficient to warrant punitive damages. Because the evaluation of the defendant's conduct necessitates an intrinsically subjective inquiry, we refuse to meddle with the fact-finding function of the jury.

■ Defendant at no time sought separate rulings by the court on the two different sets of broadcasts. It is now in no position to complain that the first set may not have afforded the basis for punitive damages. Since defendant itself was content to treat its conduct as one ball of wax, it cannot now complain that it was so treated in the verdict. Any other result would mean that a defendant, confronted with two bases of recovery, one of which may be vulnerable and the other not, could sit back and await an unfavorable result confident that he could successfully attack the entire verdict. This is not the intendment of F.R.Civ.P. 50(a) which commands that "[a] motion for a directed verdict shall state the specific grounds therefor."

■ The defendant assigns as error the court's failure to charge that the award of punitive damages must have a reasonable relationship to the amount of compensatory damages in accordance with the law of Pennsylvania. This is the general rule in Pennsylvania [7] and apparently applies in libel cases as well.[8]

■ Although numerous points for charge were submitted by both sides, defendant made no request for such an instruction. At the conclusion of the charge, defendant excepted only to the submission of the question of punitive damages to the jury at all. The only

6. Malice may sometimes be proved intrinsically. An instruction to the jury to find "whether the publication itself, in its tone and format, revealed such malice as robbed it of its privileged character" was upheld in O'Donnell v. Philadelphia Record Co., supra, 356 Pa. at 316, 51 A. 2d at 779. Although this was the "malice" that destroys the privilege, the "tone and format" of WIP's broadcasts, coupled

with the evidence of the failure to verify the information they received, was properly for the jury's consideration and sufficient to find recklessness here.

7. Suflas v. Cleveland Wrecking Co., 218 F.Supp. 289 (E.D.Pa.1963).

8. See Purcell v. Westinghouse Broadcasting Co., 411 Pa. 167, 187, 191 A.2d 662 (1963).

"grounds of his objection," F.R.Civ.P. 51, were that this was not "a case in which there were facts for the jury to consider."

Federal Rule of Civil Procedure 51 provides that: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." In Palmer v. Hoffman, 318 U.S. 109, 119, 63 S.Ct. 477, at page 483, 87 L.Ed. 645 (1942), the Court said:

" * * * In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the *precise nature* of the alleged error. Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a new trial. * * * " (Emphasis added.)

Defendant's exception here not only fell short of suggesting substantive error in charge; indeed, it suggested that if punitive damages were recoverable, the charge was legally correct.

■ Nor is this a case of fundamental error going to the very issue of liability, as in the cases cited by defendant. Mazer v. Lipschutz, 327 F.2d 42 (C.A.3, 1964) (failure to charge on the vicarious liability of a surgeon); Ratay v. Lincoln National Life Insur. Co., 378 F.2d 209 (C.A.3, 1967) (erroneous charge that burden of proof for defense of fraud could be sustained by a fair preponderance of the evidence). Suflas v. Cleveland Wrecking Co., 218 F.Supp. 289 (E.D.Pa.1963), did not involve a determination of fundamental error. The only non-substantive point briefed, argued and decided in that case was whether the failure to charge on necessary relationship between compensatory and punitive damages was harmless error.

We are not here concerned with whether the error was harmless, but whether it was so fundamental that an entire new trial should be ordered, even though the only question would be the amount of punitive damages. For that question could not be determined without showing the totality of the circumstances. And this, only because of the lack of an instruction which defendant failed to request. The salutary purpose of Rule 51 was to prevent just such an horrendous result, and we refuse to disregard that purpose.

## VI.

### A

■ The defendant argues that it was error for the court to admit certain "hearsay" testimony by the plaintiff of what certain newsboys with whom he dealt said to him. One newsboy said, according to the plaintiff, that "WIP radio was really blasting me, they were really knocking me." The plaintiff then testified as to the effect of this statement on him.

This testimony of the plaintiff was not admitted for the truth of its assertion, to wit, that WIP was in fact "blasting" the plaintiff (this was already in evidence through the introduction of the scripts), but to show what effect this statement had on the plaintiff. It constituted a verbal act.

### B

The plaintiff testified that 34 of his original 60 customers refused to do business with him, and that "They told me, in fact, 'You are a racketeer. We won't have anything to do with you.'"

■ The reasons given by the plaintiff's customers for refusal to deal constituted a well-established exception to the hearsay rule: "a declaration of a present existing *motive* or *reason* for action." Wigmore, Evidence § 1729(2), Vol. VI (3d Edition); De Ronde v. Gaytime Shops, Inc., 239 F.2d 735, 739 (C.A. 2, 1956) (a defamation case).

In any event, that evidence was offered and admitted solely on the issue of special damages. Since that issue was

taken from the jury, the error, if any there was, was not prejudicial to defendant.

### C

██ The defendant charges that it was error for the court to exclude the testimony of Paul Rust, news director of WIP, concerning the verification and investigation practices of other news departments in the Philadelphia community. The defendant is correct in its position that Rust's testimony was relevant. It was, however, incompetent because it was based on hearsay as to what other newsmen and news directors had told Rust.

### VII.

██ Although there was warrant in the record for assessing punitive damages, we believe that $725,000 is excessive in light of the function that punitive damages serve: punishing the defendant for its conduct in regard to the present case and deterring future derelictions. This is not to say that the award was the result of bias or prejudice. The jury may, however, have been unduly impressed by the fact that the worth of the defendant was estimated to be approximately $100,000,000. Since we are convinced that the award punishes the defendant far beyond the needs of this case, it is our duty to order a remittitur or a new trial. Linn v. United Plant Guard Workers of America, 383 U.S. 53, 65–66, 86 S.Ct. 657, 15 L.Ed. 2d 582 (1966). This duty of the court has been stated broadly:

> " * * * The court may set aside an award of punitive damages deemed to be excessive or against the weight of the evidence, or larger in amount than the court thinks it justly ought to be. The trial court has a greater role than the court on appeal but we may note that its function may encompass a duty, and not merely an opportunity, to avoid excessive damages by remittitur or new trial. [citing Linn, supra]. * * * " Afro-American

Publishing Co. v. Jaffe, 366 F.2d 649, 662, 125 U.S.App.D.C. 70 (C.A.1966). Cf. Curtis Publishing Co. v. Butts, supra, 388 U.S. at 160, 87 S.Ct. 1975.

The practice of the Pennsylvania courts in reducing punitive damage awards deemed excessive has been flexible. In *Purcell* the court reduced a punitive damage award "with justice to all parties concerned," 411 Pa. at 188, 191 A. 2d at 673, in spite of the fact that it stated: "The learned court below, in an able opinion, reasoned the justification of this award and we cannot say that it was not warranted in its rationalization." Ibid., at 187, 191 A.2d at 672.

Our conclusion that the punitive damages awarded are excessive is not based upon the fact that the plaintiff, entitled only to $25,000 compensatory damages would receive a huge windfall. The theory of punitive damages does not take into consideration the degree to which the plaintiff will benefit from the award. Rather, we look to the seriousness of the defendant's conduct and the degree to which it will be punished and deterred by this award. Our reaction is admittedly visceral. We conclude that punitive damages in the sum of $250,000 will adequately and justly both punish the defendant and deter it from future reckless conduct.

We have considered the other grounds urged by defendant and find them without merit.

### ORDER

And now, this 28th day of August 1968, it is ordered:

(1) Defendant's motion for judgment n. o. v. is denied.

(2) Defendant's motion for a new trial is granted, limited to the amount of punitive damages, unless plaintiff shall, within twenty (20) days of the date hereof, file a remittitur of all punitive damages in excess of Two Hundred and Fifty Thousand Dollars ($250,000), in which event defendant's motion is denied.