James **HOLMES,** Plaintiff,

v.

The **CURTIS PUBLISHING COMPANY,**
Defendant.

**Civ. A. No. 67–531.**

United States District Court
D. South Carolina,
Charleston Division.

March 7, 1969.

Morris D. Rosen, Marvin H. Wolper, Charleston, S. C., for plaintiff.

A. T. Smythe, Buist, Buist, Smythe & Smythe, Charleston, S. C., Wilbur H. Haines, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

## ORDER

SIMONS, District Judge.

This matter is before the court on defendant's motion for judgment on the pleadings. The action arises out of the publication of a feature story entitled "THE MAFIA: SHADOW OF EVIL ON AN ISLAND IN THE SUN" appearing in the February 25, 1967 issue of THE SATURDAY EVENING POST, which included a picture of plaintiff at the Monte Carlo Club on Grand Bahama Island with the caption "High-Rollers at Monte Carlo have dropped as much as $20,000 in a single night. The U. S. Department of Justice estimates that the Casino grosses $20 million a year, and that one-third is skimmed off for American Mafia 'families'." Attached to the pleadings is a copy of the article. Plaintiff's complaint sets forth two causes of action: Invasion of privacy and libel.

Plaintiff objects to the publication of a group photograph in which he appears, published at page 31, and alleges that he has been libeled and that his privacy has been invaded and put in a false light. The caption of the black and white photograph, one of two published which were taken in the casino showing gambling in progress, does not identify or otherwise refer to plaintiff or any of the other four persons shown at a gambling table apparently playing blackjack. Plaintiff is not identified by name or otherwise referred to anywhere in the article. Plaintiff is, however, the focal point of the photograph.

The caption under the other black-and-white photograph showing play at the casino, published on the facing page (page 30), states in part that "The black and white photographs of gambling were taken secretly by Post investigators."

Gambling of course is legal in the Bahamas, as the article makes clear at several places.

The article, on its face, deals with a matter of important public concern. It is a detailed report on the infiltration of Bahamas gambling by the American organized crime syndicate—the Mafia. It describes how the mob that had earlier run gambling in Cuba under the leadership of Meyer Lansky, the American Mafia's gambling expert, had taken control of gambling in the Bahamas. When Castro took over the Cuban government in 1959, the Havana casinos were closed. But four years later, when the Bahamian government granted an exemption to its anti-gambling laws to Bahamas Amusements Ltd., controlled by promoter Wallace Groves, to operate gambling casinos in the Islands, many members of Lansky's Cuban gambling organization showed up as casino employees.

The article analyzes how this happened. The Bahamas, though largely Negro, was controlled by a small group of white Nassau businessmen who ran the government through the United Bahamian Party (U.B.P.). Lawyer Sir Stafford Sands was the boss of the U.B.P. and a member of the government's Executive Council, and Groves retained him as his lawyer. Sands was instrumental in the enactment of special legislation that gave Groves control of almost half of Grand Bahama Island and made him its virtual czar. Legalized gambling was introduced in 1963 to boost tourism and the profits of the Groves companies, again through special arrangements engineered by Sands on very favorable terms. Lansky and the mob moved in with the acquiescence of Sands, Groves and the U.B.P., and helped set up and run the gambling casinos.

The article describes the tremendous growth of tourism, and particularly the phenomenal development of Freeport on Grand Bahama, which occurred as a result of the opening of gambling casinos, hotels and other tourist attractions. It tells how the Wall Street Journal in late 1966 had first revealed some of the details of the unusual cooperation, including payoff contracts, between the Groves gambling combine and members of the Bahamian government; how that newspaper also called attention to the fact that three key employees of the Monte Carlo casino were Americans and close associates of Meyer Lansky; and reports that federal grand juries currently sitting in New York and Philadelphia were investigating American Mafia involvement in gambling casinos in the Bahamas and elsewhere. It explains how the Mafia milked the Grand Bahama casinos and siphoned off a large share of the profits for five Mafia

"families" in the United States, and it related various other details of the operation.

The article also described a current news story: The January 1967 election of Lynden Pindling, head of the predominantly Negro Progressive Liberal Party (P.L.P.), as Premier of the Bahamas and the rejection of Sands and the U.B.P. Pindling had made American Mafia infiltration of Bahamas gambling a major campaign issue. The Post discussed Pindling's campaign and his wholly unexpected upset victory. The article considered the significance of Pindling's election, including his preliminary plans for rooting the Mafia out of gambling.

Defendant's motion is based on New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and the cases thereafter following [1] which limited a state's laws on libel and invasion of privacy to bring them into conformity with the First Amendment.

It should be pointed out that before the court is only plaintiff's complaint and defendant's answer. In most other instances involving a similar question the court has had before it either the entire trial transcript or at least a substantial record built by depositions as in the recent case of Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1968).

The court has studied the cases cited by the parties and has done considerable independent research of its own.

The law in regard to invasion of privacy and libel remains somewhat unsettled in a situation such as this, as the lower courts continue to interpret the significance and meaning of the recent Supreme Court decisions in this field.

It is obvious that where a public official is involved the constitutional

[1] Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); Curtis Publishing Co. v. Butts and Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); Pickering v. Bd. of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

privilege of free speech is defeasible only upon proof of publication with actual malice—with knowledge that it was false or with reckless disregard of its falsity. And where a public figure is involved, "on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigating and reporting ordinarily adhered to by responsible publishers." Curtis Publishing Co. v. Butts, Note 1, *supra.*

The cases since *Sullivan* and *Butts* interpreting the majority, concurring, and dissenting Supreme Court opinions further define the meaning of the *Sullivan* standard and indicate that "there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Time, Inc. v. McLaney, *supra,* citing St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323 (1968).

This court entertains doubts as to whether the standard as expressed in these words is appropriate in a situation such as plaintiff's in the instant case. All of the Supreme Court opinions— majority, concurring and dissenting— indicate agreement that First Amendment rights apply, but differ on the standard to be applied to the particular situation. As expressed in United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., 404 F.2d 706 (9th Cir. 1968):

"Rather, the difference [expressed by the various Justices] has been on whether there should be gradations in the standard for defeasance of the immunity (in effect negligence, gross negligence and reckless diregard, respectively) to enable the falsity occurring in a publication to be dealt with on varying responsibility as to the type of situation involved. The minority would seem to desire appraisal of the nature of the public interest at stake and gradations on the basis thereof as to making the immunity defeasible for the incompleteness, inaccuracy and falsity occurring in the statements and comments made."

The underlying rationale of the *Sullivan* doctrine is to insure freedom of expression, and that the public's opinion is effective in bringing about political and social changes desired by the people. However, an individual is entitled to have his reputation and privacy protected also. There necessarily is a conflict of public information versus individual rights, which should be resolved in a proper manner so as to foster a reasonable public policy, as well as to protect and defend individual rights, depending of course upon the circumstances involved.

In *Butts,* 388 U.S. at page 148, 87 S.Ct., at page 1988, the court stated: "In Time, Inc. v. Hill, *supra,* 385 U.S. at 390 [87 S.Ct. 534 at 543] we counseled against 'blind application of New York Times v. Sullivan' and 'considered the factors which arise in the particular context.'"

In Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534 (1967), the Supreme Court made clear that the *New York Times* standard applied likewise to actions for invasion of privacy and to discussions in which matters of great public interest are involved.

The Supreme Court cases thus far have not only involved matters in which there was public interest; but also have involved, if not public officials, public figures, or one who has thrust himself into public discussion. In instances other than those there remains much confusion.

In Rosenbloom v. Metromedia, 289 F.Supp. 737 (E.D.Pa.1968), it was felt that the *New York Times* standard did not apply to that particular plaintiff since he was not a person in the limelight, and did not have the means at his disposal to dispute charges made against him.

In Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649 (1966), which involved the alleged defamation of a newsstand owner, the

court found the *New York Times* standard not applicable, stating:

"We conclude that *New York Times*, as written and likely to be extended, does not and will not preclude recovery, even in the absence of malice, by a man whose role is as non-public as plaintiff's, by a man who has not mounted a public rostrum, made an appeal to the public, sought or received public funds, offered a service or product for public use or comment, or organized a boycott or other group activity by members of the public."

In the present case, plaintiff was no more than an innocent tourist whose picture was taken without his consent while he was participating in a legal activity. He by no means had thrust himself into the public limelight.

In All Diet Foods Distributors, Inc. v. Time, Inc., 56 Misc.2d 821, 290 N.Y. S.2d 445, plaintiff's case was dismissed on the basis of Times v. Sullivan. In *All Diet,* a retail health food and special diet store brought suit for libel against the publisher of an article on nutrition, which showed a photograph of plaintiff's store with a caption on an adjoining page of "Food Fads and Frauds". The court finding the *Sullivan* standard to apply stated:

"Certainly the subject matter of the article under review is of considerable public interest and it cannot be said of the conduct of the defendant with respect to motivation that the complaint meets the required standards. Certainly the intent here was not merely to injure through falsehood; rather the motivation was the protection of the public in the disclosure of a highly important matter affecting the public interest."

In Time v. McLaney, *supra*, plaintiff was one who had placed himself into the public issue. The *McLaney* case and the present case involved the same *Post* story and certainly it is one of public concern considering the increasingly large number of Americans who travel to the Bahamas. The Court of Appeals for the Fifth Circuit remanded the case to the District Court with instructions to enter summary judgment for the defendant. It should be noted however that a "substantial record" by deposition had been established in that case.

In United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., *supra*, involving comment on inaccuracies in mail order medical laboratory studies, the court held that since the subject matter pertained to public health the same immunity should be granted as is given to "public officials." The court found that First Amendment immunity of the *New York Times* standard for defeasance was controlling and stated:

"In order to recover, United Labs would have to prove with 'convincing clarity' that the statements of the publications, if they could be defamatory of it, were made with knowledge that they were false in their alleged implications against it or were made with reckless disregard of whether they were false or not."

After considering the above mentioned cases, as well as numerous others, it appears that the weight of authority indicates that the *Times* standard does apply to all matters involving public interest; consequently, plaintiff in this case must meet this standard as defined in the *United Medical Laboratory* case, and prove either actual malice or reckless disregard of the truth in order to recover.

Because the proofs in the *Hill* case, *supra*, reasonably would either support a jury finding of innocent or mere negligent misstatement by the defendant, or a finding that defendant portrayed the play as a reenactment of the Hill family's experience reckless of the truth or with actual knowledge that the portrayal was false, the case was remanded by the Supreme Court for that determination under proper instructions.

■ Likewise, in the present case the court cannot say as a matter of law solely from the pleadings that the caption under plaintiff's photograph was not of and concerning him. It is a matter on which reasonable minds might differ. Considering the article and the photograph of plaintiff contained therein, in the light of the allegations of plaintiff's complaint, the court concludes that plaintiff should be given his day in court to prove his case. If he is able to shoulder the burden of proof necessary to meet the *New York Times* standard, then there would be an adequate basis for a reasonable inference upon which the jury may find that the caption under the photograph was "of and concerning the plaintiff" identifying him either as a "high roller," or as one connected with the Mafia, as a houseman or otherwise, which would surely damage him in his business and/or reputation, and that the same was published with actual malice—with knowledge of its falsity, or with reckless disregard of whether it was true or not.

The South Carolina definition of "defamatory matter" is substantially in accord with that given the term by courts in other American jurisdictions. In Hartyog v. United Press Associates, 202 F.2d 81, 82 (4th Cir. 1953) the court quoted with approval United States District Judge Wyche's definition in Lesesne v. Willingham, 83 F.Supp. 918, 921 (E.D.S.C.1949):

"It seems to be well settled in this State (South Carolina) that any words which falsely or maliciously change the commission of a crime, or which distinctly assume or imply one has committed a crime, or which raise a strong suspicion in the minds of hearers or readers, that one has committed a crime, or which plainly and falsely charge the contraction of a contagious disease, adultery or a want of chastity, or unfitness in the way of a profession or trade, or any written or printed words which tend to degrade a person, that is, to reduce his character or reputation in the estimation of his friends or acquaintances, or the public, or to disgrace him, or to render him odious, contemptible, or ridiculous, are actionable per se." [Citations omitted].

Likewise, from Hubbard v. Furman University, 76 S.C. 510, 57 S.E. 478 (1907):

"A libel is a malicious defamation, * * * tending * * * to impeach the honesty or integrity or reputation, or publish the natural or alleged defects, of one who is alive, and thereby to expose him to public hatred, contempt, ridicule or obliquy, or to cause him to be shunned or avoided, or to injure him in his office, business, or occupation."

■ Certainly defendant's caption is reasonably capable of amounting to defamation, for one identified as a highstakes gambler or having a connection with the Mafia would certainly be injured in his business, occupation, and/or reputation.

■ As to plaintiff's action for privacy, there appears no question that if it were not for defendant's caption beneath plaintiff's photograph, this court would be justified in dismissing plaintiff's invasion of privacy cause of action. But such is not the case. Conflicting inferences also arise from the record as it stands today which preclude disposition of this cause of action summarily.

If this court had the benefit of a more complete record its decision might be otherwise. However, from the pleadings alone it is concluded that plaintiff should have an opportunity at trial to establish either his cause of action of libel or invasion of privacy. The trial judge after hearing plaintiff's evidence will be in a much better position to determine whether he has made out a prima facie case for libel or invasion of privacy under the *New York Times* standard.

Accordingly, defendant's motion for judgment on the pleadings is denied.

In accordance with Section 1292(b) of 28 U.S.C.A., the court hereby certifies that it is of the opinion that the within order involves controlling questions of law as to which there are substantial differences of opinion among the recorded cases, and one of first impression in this court; that an immediate appeal from the within order denying defendant's motion may materially advance the ultimate termination of the litigation; and that the defendant should have the opportunity to apply to the Court of Appeals for the Fourth Circuit for permission to take an appeal from such order, if it should so desire. Should application for an appeal be made by defendant and such permission be granted by the Court of Appeals, then further proceedings in this court shall be stayed until a determination of the appeal.

And it is so ordered.